# Montgomery Gas-Light Co. *v.* City Council of Montgomery.

*Bill in Equity for Injunction against Municipal Corporation, in matter of Contract with Gas Company.*

1. *Remedy for breach of contract with municipal corporation, granting exclusive privilege.*—On the breach of a contract between a municipal corporation and private persons, or a private corporation, granting the exclusive privilege of lighting the streets with gas for a term of years, the city may treat the contract as abrogated, and grant the privilege to other persons, although it might also maintain an action at law for damages; but a bill for specific performance would not lie, where the breach consists in the failure to appoint appraisers of the property, on the election of the city to purchase, as authorized by the terms of the contract.

2. *Contract between city of Montgomery and Montgomery Gas-Light Company; election by city to purchase at appraised value, on expiration of twenty-five years.*—Under the contract by which the city of Montgomery granted to Jeffrey & Co., their successors and assigns, now the Montgomery Gas-Light Company, the exclusive privilege of lighting the streets of the city with gas, for the term of fifty years from November 1st, 1852; the provision contained in the 8th section, giving the city "the right or privilege," at the expiration of twenty-five years, "of purchasing from said Jeffrey & Co., their associates, successors and assigns, all the pipes, buildings and apparatus constituting the gas works, at such price as may be determined by five disinterested men," to be selected as therein provided, confers only a right of election to purchase, at a price to be afterwards ascertained, and not a right to have appraisers appointed, with a view to a subsequent election to purchase based on their appraisement; and the company is not in default, because of a refusal to appoint appraisers in advance of an election to purchase.

3. *Same; when election may be exercised.*—This right of election on the part of the city, conceding that it might be exercised within a reasonable time after the expiration of the twenty-five years, is certainly lost after the lapse of eight years more; and a bill then filed by the gas company, seeking to enforce its rights under the contract, or to enjoin any violation by the city, need not aver an open and continuing offer to the city to purchase.

4. *Injunction against municipal corporation in matter of exclusive franchise.*—If an individual, or a private corporation, having granted an exclusive franchise or privilege, afterwards attempts to repudiate it by an inconsistent grant to another person, which would cast a cloud on the title held under the first grant, a court of equity will interfere by injunction; and if a municipal corporation should grant an exclusive franchise or privilege, and afterwards, in violation thereof, grant a similar franchise or privilege to other persons, who threaten to exercise it to the injury of the original grantees, a court of equity would enjoin the threatened action; but it would not interfere by injunction to prevent the passage of an ordinance by the municipal corporation, or the making of a contract by it, on the ground that such action would be violative of the franchise already granted.

[Montgomery Gas-Light Co. v. City Council of Montgomery.]

APPEAL from the City Court of Montgomery in equity. Heard before the Hon. THOS. M. ARRINGTON.

The bill in this case was filed on the 28th December, 1885, by the Montgomery Gas-Light Company, a private corporation, against the corporate authorities of the city of Montgomery; and prayed an injunction, restraining the defendants "from entering into any contract, or passing any ordinance, granting to any person or corporation the right to lay pipes for conducting gas under any street, alley or thoroughfare within the corporate limits of said city, before the 1st day of November, A. D. 1902," in violation of an exclusive franchise claimed by the complainant under a former contract and ordinance. On final hearing, on pleadings and proof, the bill was dismissed; and the decree dismissing it is now assigned as error. The opinion of the court states all the material facts.

TOMPKINS, LONDON & TROY, and JNO. GINDRAT WINTER, for the appellant.—(1.) The bill makes a clear case for an injunction, if the appellant's construction of the contract be correct.—Casey v. Holmes, 10 Ala. 776. (2.) The contract gave the city a right of election to purchase the property, on the expiration of twenty-five years, at a valuation to be fixed by appraisers; but not a right to require the appointment of appraisers in advance, "with a view to purchase;" and until the city declared its election to purchase, the company was not bound to appoint appraisers. It was nothing more or less than an offer by the company to sell its property to the city on a future day, at a price to be fixed by appraisers, if the city elected to purchase.—1 Chitty on Contracts, 15, note; 1 Benj. Sales, p. 54; Newton v. Newton, 23 Amer. Rep. 476. But this offer was not continuing; the option was to be exercised at the expiration of twenty-five years, and the company was not bound to extend it for a further period of eight years.—Richardson v. Hardwick, 106 U. S. 252; Longworth v. Taylor, 1 McL. 395. (3.) Even if the city's construction of the contract be correct, the failure of the company to appoint appraisers gave it no right to declare the contract abrogated, or to treat the franchise as forfeited. Its remedy was by an action at law for damages, or a bill in equity for specific performance, under which the court would have appointed appraisers.—Chapin v. School District, 35 N. H. 445; Emerson v. Simpson, 80 Amer. Dec. 184; 10 Amer.

[Montgomery Gas-Light Co. v. City Council of Montgomery.]

& Eng. R. R. Cases, 234; *Smith v. Peters*, 15 Eng. Rep. 463; 1 Sm. & G. 184; *Durham v. Bradford*, L. R. 5 Ch. 519.

WM. S. THORINGTON, with whom was SAM. F. RICE, *contra.* (1.) By the terms of the contract between these parties, the city of Montgomery, acting for the public, granted to the complainant a valuable franchise, for a long period of time, but reserved to itself the privilege of purchasing the property, at the expiration of twenty-five years, at an appraised valuation. Whether this stipulation was intended to act *in terrorem*, securing better service on the part of the company, or was inserted from economic considerations, it was in the interest of the public as represented by the city, and was intended for the benefit of the city. To make an election— to exercise the privilege of purchasing understandingly—an appraisement of the property was an indispensable pre-requisite. An election, made without knowledge of the facts, is not binding in any case. To require the city to elect to purchase, without an appraisement of the property on which to base its election, would destroy the benefit intended to be secured, and might work great injury. The contract is in the nature of a legislative grant, and is to be construed most strongly in favor of the public.—*Wright v. Nagle*, 101 U. S. 794; *Railroad Co. v. Litchfield*, 23 How. 66, 88; *Slidell v. Grandjean*, 111 U. S. 437; Endlich Stat., §§ 349, 354; *Willard v. Taylor*, 8 Wall. 557; *Home v. Rouse*, 8 Wall. 437. That a contract may be obligatory on one party, and optional as to the other, see 2 John. Cases, 254; Doug. Rep. 23; 1 T. R. 132; Cowp. 818; 2 Chitty on Contracts, 1061, 11th Amer. ed. (2.) The appointment of appraisers was requested "with a view to purchase;" and if the contract bound the city to purchase, the company could not legally refuse to appoint appraisers. (3.) The city had a right to treat the contract as rescinded, on the breach by the company.—Bish. Contracts, § 837; Anson on Contracts, 253–4. (4.) The bill does not make a case for injunction. 44 Iowa, 505; 25 Conn. 19; 2 Story's Equity, § 959*a*, note 6; 1 Beasley, N. J. 499.

McCLELLAN, J.—This bill was filed by the Montgomery Gas-Light Company, against the City Council of Montgomery, to enjoin the city authorities from "entering into any contract, or passing any ordinance granting to any person or corporation the right to lay pipes for conducting gas

under any street, alley or thoroughfare within the corporate limits of said city, before the first day of November in the year 1902." The facts upon which this relief is sought may be epitomized as follows:

On the 30th day of August, 1852, the City Council of Montgomery passed an ordinance "to provide for the lighting of the city of Montgomery with gas," in and by the first section of which it was provided, "that the exclusive privilege shall be, and the same is hereby, granted for the term of fifty years from the first day of November, A. D. 1852, to John Jeffrey & Co., of Cincinnati, Ohio, their associates, successors and assigns, of laying pipes for conducting gas under any street, alley or thoroughfare within the corporate limits of the city." This grant is made to depend upon certain conditions, specified in section 2 of the ordinance, which is in the following language: "That the privilege herein granted is upon the condition, that the said John Jeffrey & Co. shall, on or before the first day of May, A. D. 1854, have completed the requisite apparatus for manufacturing gas, ·and shall have laid in connection therewith three miles of main pipe in the streets of Montgomery, and shall further lay, from time to time, such additional main pipes in any street, alley or thoroughfare, as shall be required by the city council; *Provided*, that the demand for gas to be supplied by such extensions, shall afford a reasonable prospect for a fair remuneration." Subsequent sections required Jeffrey & Co., their successors and assigns, to furnish from time to time, and at all times, for the public use and benefit, such quantities of gas, of the most approved quality, as might be needed for lighting the streets of the city, at one-half the price per cubic foot, at which gas is furnished to individuals; and that gas in like quantity, and of the same quality, should be furnished the inhabitants of said city, at as low a price as gas, under similar conditions, is furnished to the inhabitants of any other Southern city of equal or greater population.

By section 8, with the terms of which we are chiefly concerned, it is provided: "That at the expiration of twenty-five years from the first day of November, A. D. 1852, the City Council of Montgomery shall have the right or privilege of purchasing from the said John Jeffrey & Co., their associates, successors and assigns, all the pipes, buildings and apparatus constituting the gas-works, at such price as may be ascertained and determined by five disinterested men, two of whom

shall be chosen by the City Council of Montgomery, two by said John Jeffrey & Co., their associates, successors and assigns, and the fifth by the four thus chosen."

Section 9 evidences the purpose and contemplation of the parties, that Jeffrey & Co. should secure a legislative charter, in order to afford citizens and the City Council the opportunity to take shares in the capital stock of a corporation, to be organized thereunder as the successor of the original grantees. The ordinance was assented to by Jeffrey & Co., and went into effect on October 14th, 1852.

The contract thus made, by the adoption of the ordinance on the part of the city and the assent of Jeffrey & Co. to its terms, was soon afterwards assigned by Jeffrey & Co. to certain associates, who were constituted a body corporate by an act of the General Assembly, approved February 15, 1854, which act expressly ratified and confirmed the original contract, as a compact between said company, the complainant in this cause, and the City Council. Under this contract, the gas company established a plant for the manufacture of gas, and laid pipes under the streets for its distribution to and throughout the city, and carried on the business in accordance with the ordinance, for the first twenty-five years of the grant. At the end of this time, the City Council sought to avail itself of the right and privilege guaranteed to it by section 8 of the ordinance, as that section was construed on the part of the city; and "with a view to purchasing" the property of the gas-company, appointed two men, who were citizens of Montgomery and gas-consumers, to act, with two others to be appointed by the company, and a fifth to be selected by the four thus appointed, in the valuation of such property. The company was notified of this action, and requested to name the two appraisers on its part. This the company declined to do, on two grounds: *first*, that the right reserved to the city, by section 8, was the right to purchase the property, and not the right to have it appraised with a view to purchasing, and that the city had not made its election, upon which alone depended both the necessity and right to have the price fixed; and, *second*, that the city had failed to comply with the terms of section 8 as to the character of the appraisers it had appointed, in that those named by it were not "disinterested men," as therein required. The City Council, considering that this refusal and failure on the part of the company was a breach of the contract, in such sort that the city was authorized to repudiate

it *in toto*, notified the gas company of its determination so to do, and has ever since treated it as ended. Acting upon the assumption that the contract was no longer binding upon it, and no longer secured to the company the exclusive use of the streets in the distribution of gas, the city, in 1885, was about to grant this privilege to other parties, and to enter into contracts with them for furnishing gas to the city and its inhabitants. The appellant's right to enjoin this threatened action by the municipal authorities is now presented for our consideration.

It may be taken as conceded by the arguments at the bar, that the grant of the exclusive privilege to lay pipes in the streets of the city, for the considerations stipulated, was a valid exercise of corporate power, confirmed, as it was, by legislative action. Whether a like grant would be upheld under the provisions of the constitution now in force, we need not decide. It will also be treated as admitted, that the Montgomery Gas-Light Company succeeded to all the rights of John Jeffrey & Co., and for the first twenty-five years of the grant complied with all its terms and conditions; and hence was, for that time, entitled to the exclusive privilege conferred by the ordinance.

Much has been said in argument concerning the rights of the city in the premises, assuming a breach of the contract, in the particular referred to, to have been committed, on the part of the gas company. The appellant insists, that the city's remedy for such violation lay in an action for damages; or, if this mode of redress should be held inadequate, full relief could be had on a bill for specific performance. On the other hand, the appellee contends, that commensurate relief could only be had by treating this contract as abrogated, and securing the benefits, which the default of the company had denied to it, through another contract with other parties, on whom it proposed to confer the privilege of using the streets for the purpose of distributing gas. This right is denied by the appellant, because, it is said, to allow it would be to give section 8 the effect and operation of a condition subsequent, which its terms do not import or require; and we are referred to the authorities which support the doctrine, that such conditions are not favored in the law, and the language of contracts should be construed, in cases of doubt, against the divestiture of an estate by acts or omissions occurring after its creation. Without, for the present at least, entering upon an elaborate consideration of

these questions, it will suffice to say generally, that it would seem that the city is without adequate remedy for the alleged breach, unless it is permitted to avail itself of the right to annul the contract; at least to the extent of avoiding the consequence of the exclusive grant of the privilege of laying pipes in the streets. It is readily conceivable that actions for damages would fall short of conferring exact justice between the parties; and, were this otherwise, the existence of this remedy would not be inconsistent or incompatible with the exercise of the right of abrogation.

The other mode of redress suggested by the appellant does not exist. There is no principle better settled in reason and by authority, than that an executory contract for the sale of property, by the terms of which the price to be paid for the whole subject-matter is to be determined by appraisers, to be selected directly or indirectly by the parties, can not be specifically enforced in equity, so long as there is a failure from any cause to appoint referees, or a failure of such referees, after appointment, to assess the value.—*Vickers v. Vickers*, 3 Eq. Cases (L. R.) 532; *Milnes v. Gery*, 14 Vesey, 400; *Cooth v. Jackson*, 6 Ves. 34; *Thurnell v. Balburnie*, 3 M. & W. 786; 1 Benj. on Sales, p. 54; 2 Benj. Sales, p. 755. A different rule prevails, where the thing which is to be appraised by such valuers constitutes only a minor part of the subject-matter of the contract; as, for instance, where land is purchased at a fixed price, but the contract of sale also includes fixtures, or timber, or furniture, the valuation of which is to be determined by third persons; or, as in the case of a contract of partnership, containing a stipulation for a sale by one co-partner to the other, on dissolution, at a price to be ascertained by arbitrators. But the case at bar is not of this class.—*Smith v. Peters*, 20 Eq. Cas. (L. R.) 511; *Dinham v. Bradford*, 5 Ch. App. Cas. 521.

The attitude of the city could be justified, by treating its contract as a grant of the right to lay pipes in its streets, coupled with a covenant not to grant a like privilege to others for fifty years; and so regarded, it would be competent for the city, upon the failure of one of the considerations on which it so covenanted, through the default of the company with respect to the right of purchase given by section 8 of the ordinance, to hold itself no longer bound thereby. This view, we think, might be taken, and this construction resorted to, if necessary to the ends of justice. Whether it is necessary depends, of course, upon the question, whether

there was a default on the part of the company with respect to the duties imposed on it by section 8; and this, in turn, depends solely on the construction that should be given to that section, for the facts are undisputed. And this brings us to the consideration of what must be regarded as the main question in the case : *Was the action or non-action of the company, in the matter of the appraisement of the gas works, a breach of its contract ?* Undoubtedly, the only valuable, substantive right secured to the city by section 8, was the right to purchase. If it had an opportunity to make its election, under and as contemplated by that section, the company has not been in default. What was essential to the exercise of the right, within the purview of the terms which granted it? Was it necessary to have a valuation made before the duty of election devolved on the city? Or does the contract mean that the election should be made by the city, unaided and unadvised in the premises by the appraisement provided for in the instrument? Was the fixing of the price by five disinterested men to serve in the first instance as a basis for the exercise of the option, and then as a basis of settlement between the parties only in the event the city, as admonished thereby, should elect to buy? Or were these men to act only after the election to purchase had been made, and then to ascertain and determine what sum should be paid and received by the parties respectively? It is to be borne in mind that the right to purchase was secured many years before it was to be exercised. Neither the value of the property, nor the ability of the city to pay for it, at any price, great or small, could be foreseen. Nor could it be determined so long in advance whether, granting that a reasonable and fair valuation, and one within the financial competency of the city, should be fixed, it would be to the interest of the city to purchase. To enable the city to deal with a present condition into which all these future contingencies should have resolved themselves, and to effectuate whatever it might in 1877 conceive to be its interest, it was given the right and privilege, without any corresponding obligation, to purchase when a certain time elapsed, at such price as might be ascertained by disinterested third persons. It is not to be assumed that either party expected to gain any advantage over the other by this stipulation. They contracted *in limine,* upon terms of equality. Is there anything in the contract to warrant the inference that it was contemplated that, at any time, or with respect to any matter

under the contract, the situation of the parties should be so changed as to put either in a better position with reference to the subject-matter than the other? To admit the construction of section 8 insisted on by the city, would have this effect. Under that construction, the company would have been compelled to sell its property at the assessment of the referees, but there was no compulsion on the city to make its election on that basis. On the contrary, it would have had the further right to pass its own judgment on the fairness and reasonableness of the price thus fixed. This would be to bind the company absolutely by the appraisement, but to impose no correlative obligation on the city. The company had no option to decline the price so ascertained, however inadequate in point of fact, while the city was bound to pay that price only on the condition and in the event its judgment coincided with that of the valuers.

The presumption would be, that a construction which produces such an unequal *status* of parties, who, in the outset, at the time of executing the stipulation in question, and with reference to that stipulation, dealt on terms of the utmost equality, is not in accordance with their intention; and it should not be allowed to obtain, unless the language employed by them requires it. Does the language of section 8 lead to this result? It is possible to impute two purposes to the parties in the use of the words, "at such price as may be ascertained and determined by five disinterested men," &c. One of these purposes could have been subserved by holding the meaning to be that, after the city had elected to purchase, there should be an ascertainment and a determination by five men of the amount it should pay. The only other possible meaning is, that the appraisement should be first made, and the city's election predicated on it. Considering, on the one hand, that many things might have transpired between the date of the contract and the time at which the option of the city was to be exercised, to make the sale objectionable to the company, and to induce it to throw obstacles in the way of the city's acquisition of its property; and on the other hand, that the property of the company was of such public character, so open to inspection, especially on the part of the municipal authorities, is it not more reasonable that the provision quoted was intended to further and secure the consummation of the sale after election made, than to afford the city data upon which to make

the election. It would, we apprehend, have been an easy matter for the city officers, with their necessarily intimate knowledge of the pipes, apparatus and buildings constituting the gas-works, to have sufficiently approximated their value as to determine intelligently whether it would be to the interest and within the ability of the city to buy the plant; but it would have been simply impossible for a sale to have been consummated, or the gas company put in default in respect to it, if the company was unwilling to dispose of its property, without the arbitration of third persons. Nor is it conceivable that this interpretation of the contract works any detriment to the city. As we have said, it can not be taken for granted to have been in the contemplation of the parties that any undue benefit was to accrue to either of them. On the contrary, care was taken to secure an impartial, fair, and reasonable valuation. The presumption is, that the *consensus* of five disinterested men would have attained the purpose, and ascertained and determined that the city should pay, and the company should receive, the fair and just equivalent of the property, no more and no less. So long as the right of the city to acquire the gas-works at a fair price is not denied, or abridged, can it be said that the real and only substantive right which section 8 secured to the city—the right to purchase at a fair price—has been defeated? If not, it would seem that the construction which the appellant insists on would meet all the exigencies of the case. The idea of equality and mutuality between the parties would be maintained, so that neither, with respect to the right provided for in section 8, would be put at a disadvantage; the intention of the parties, which surely could not have been other than that the city might purchase the gas-works at the value the referees should fix, would be fully effectuated; and the rights of the parties would be protected.

The same conclusion would be reached by considering the question from another point of view. The legal effect of section 8 of the ordinance was to impose on the gas company the duty of offering its property to the city, at a price to be ascertained and determined in a certain way. The rights of the parties on November 1, 1877, were precisely the same as if the contract had been silent as to the city's right to purchase; and the company, of its own volition, not induced thereto by an antedecent obligation, had then offered to sell its property to the city "at such price as may be ascertained

and determined by five disinterested men," to be selected in a prescribed manner.—*Hunt v. Wyman*, 100 Mass. 198; *Newton v. Newton*, 23 Amer. Rep. 478; *McCall v. Powell*, 64 Ala. 254. The right secured to the city was to say whether it would accept or reject this offer, in the identical terms in which it was made. The offer was not open to qualification by the acceptance. Any attempt to accept, which imported new terms, would have been a rejection. Any suggestion of a different contract than was proposed by the offer, was a rejection of it. The offer put it on the city to say, not that it would have the valuation made, and then determine whether it would accept the proposition, but to say whether it would buy at such valuation as might be ascertained and determined in the prescribed manner. The offer implied that the seller took the chances of a fair valuation by appraisers. The acceptance, to be responsive, must assume the same uncertainty on the part of the purchaser. To accept upon the condition that the appraisers shall first determine upon a price the acceptor is willing to pay, is manifestly not only no acceptance at all, but is an affirmative rejection of the offer.—*Hutcheson v. Blakeman*, 3 Met. (Ky.) 80, and authorities therein cited; *Fox v. Turner*, 1 Ill. App. 153; 1 Benj. on Sales, pp. 53-54; *Falls v Gaither*, 9 Port. 605. The gas company having made the offer in accordance with its contract so to do,—for it is abundantly shown by the record that nothing was done by the company to hinder in any degree the city's exercise of its election,—thus discharged the only duty then resting upon it. Its further duty depended upon the city's acceptance of the offer in the terms in which it was made. The city not having accepted the offer, it was not incumbent on the company to appoint appraisers, and its failure in that regard was not a breach of its contract.

It is thus seen that, from whatever point of view section 8 of the ordinance is regarded, the same result as to its interpretation is reached. Every consideration of fact presented by the transaction, and every principle of law applicable to it, concur in the enforcement of the conclusion, that the right of the city was to make its election with reference to the purchase of the property at a price to be thereafter appointed; until the city exercised this option in such way as to bind it to purchase, there was no obligation on the company to proceed with the appraisement; that the city did not elect to purchase, and the company was not in default by reason of its failure to appoint appraisers.

The view thus taken of this case renders it unnecessary to consider the other objection on the part of the gas company to proceeding with the appraisement. The mere appointment of appraisers by the city, however unexceptionable the appointees may have been, did not, in the absence of an election to purchase, impose any duty on the company to proceed with the appraisement; and whether appraisers selected by the city were disinterested men, within the meaning of the contract, is an immaterial inquiry.

Considering the effect of section 8 to be, as we have said, to require an offer to be made by the gas company on November 1, 1877, to sell its property to the city, and the rights of the parties on that day to have been the same as if the offer had not been induced by the contract, it follows that the subsequent rights of the parties are to be determined by the principles of law applicable to ordinary offers to sell, in which there is no limitation or specification of the time in which the proposition is to be passed on and accepted or rejected by the other party. Under such circumstances, the rule is well settled, that the acceptance must be made within a reasonable time. What would have been a reasonable time in this case, we need not undertake to determine with any approach to precision—a week, it may be, or a month, or perhaps longer—as the question here is, whether the proposition was open to acceptance up to December 28, 1885, when the bill was filed; and we have no hesitancy in saying that was far in excess of our conception of what would have been a reasonable time during which the gas company should have held itself ready to consummate the sale to the city council. 1 Benj. on Sales, p. 61, *n*; *Judd v. Day*, 50 Iowa, 247; *Martin v. Black*, 21 Ala. 721.

This construction comports with the language employed by the parties, which gives the right of purchase "at," and not after a particular time, or for an indefinite period; and is the more reasonable in view of the fact that the property is of that character in which investments are usually made with regard to their permanency, and that an outstanding indefinite right of purchase would naturally depreciate its value. The company, at the time of instituting this suit, was, therefore, under no obligation to sell to the city, and was not required to embody an offer to do so in its bill.

It remains to be considered whether the case presented by the bill of complaint is such a one as calls for, or admits of the interposition of a court of equity by injunction. If an

[Montgomery Gas-Light Co. v. City Council of Montgomery.]

individual or private corporation had granted a franchise like that involved here, and was about to repudiate the grant, and make other contracts with respect to its subject-matter, which would cast a cloud on the title held under the first grant; or, if in this case, the city had already passed an ordinance granting the privilege to private parties, who were threatening to exercise it to the injury of the original grantee; in either of these cases, unquestionably a court of equity would enjoin the threatened action.—*B. & P. M. St. Railway Co. v. B. St. Railway Co.*, 79 Ala. 465; High on Inj., §§ 902 *et seq.* But the prayer of this bill is to enjoin—not the use of the streets, or any infringement, in point of fact, or any other actual encroachment upon the exercise of that privilege by the company—but the passage of an ordinance, granting this privilege to others, or providing for the execution of a contract with others under which they will be authorized, so far as the threatened action can have that effect, to lay pipes in the streets, the grant to the appellant to the contrary notwithstanding. In the well considered case of the *Des Moines Gas Co. v. City of Des Moines*, which was precisely identical with this case in the particular under consideration, it was held, in an able and exhaustive opinion, that the bill to enjoin the city authorities from the adoption of an ordinance repealing a former grant of the exclusive privilege to lay gas pipes in the streets of the city, and granting that privilege to others, would not lie. The decision was put on the ground, mainly, that the threatened action was legislative in its character, and as such, at least within charter limitations, was as fully exempted from judicial control as the action of the General Assembly of the State in the passage of laws. A further reason for denying the relief sought is thus stated by the learned judge: "If the ordinance sought to be enjoined is void by reason of its unconstitutionality, the plaintiff can be in nowise injured by its passage. A void law is no law, and this without doubt is true as to an ordinance. No injury, much less one of an irreparable character, can be inflicted by such an ordinance."—*Des Moines Gas Co. v. City of Des Moines*, 44 Iowa, 505.

The principle announced in this case has received the indorsement of such text-writers as Dillon and High, and is supported by the weight of adjudications.—High on Injunc. § 1246; 1 Dillon Mun. Corp. § 308; *Chicago v. Evans*, 24 Ill. 52; *Smith v. McCarthy*, 56 Penn. St. 359.

We consider this the better view of the question, though

17

[Leinkauff & Strauss v. Forcheimer & Co.]

there are one or two cases which seem to hold the contrary, with respect to an ordinance, the purpose of which was to make a contract—a distinction which is expressly repudiated in the leading case *supra*—but, at the same time concede the general doctrine, that legislative action of municipal corporations can not be enjoined; and upon this ground the decree of the City Court will be affirmed.

CLOPTON, J., not sitting.